## Case No. 15,500.

### UNITED STATES v. JUARES.

[Cal. Law J. & Lit. Rev. 106.]

District Court, N. D. California. Nov. 9, 1862.

MEXICAN LAND GRANTS—EVIDENCE TO ESTABLISH —FORGED PAPERS—ABANDONMENT —DESCRIPTION.

1. The existence of the expediente in the Mexican archives with unquestionably genuine signatures, the note and description of the grant in the continuation of Jimeno's Index by Hartnell & Halleck, the entry in the Toma de Razon, and the records in the journals of the departmental assembly, prove, beyond all doubt, that the grant was made—notwithstanding the expediente does not contain the customary borrador, or copy of the titulo, delivered to the party.

2. Where a grant is unquestionably genuine, it will not be invalidated by an accompanying titulo which is forged and fraudulent, where it appears that neither the parties before the court claiming under such grant, nor the original grantee, were implicated in such fraud.

3. Forfeiture of a grant by abandonment cannot be predicated on any failure to occupy and cultivate, occurring subsequently to the acquisition of California by the United States. The rights of the United States and of the claimant remain in their then condition, unaffected by any acts or omissions of the grantee.

4. Quaere—whether there can be an abandonment of a grant made "definitely valid" by the approval of the departmental assembly?

5. Where the question is whether a tract of land is sufficiently described to be well defined and intelligible, and the judge has personal knowledge relative to it, he will weigh that personal knowledge in connection with the testimony of witnesses.

[This was a claim by Cayetano Juares for Yokaya, eight square leagues on Russian river, in Mendocino county, granted May 24, 1845, by Pio Pico to Cayetano Juares. Claim filed September 11, 1852, and rejected by the commission November 7, 1854. It is now heard upon appeal of the claimant to the district court.]

HOFFMAN, District Judge. The expediente in this case shows that on the 8th April, 1845, Cayetano Juares petitioned Governor Pio Pico for "eight square leagues, more or less, in the land known as 'Yokaya,' to the north-west of Sonoma, distant thirty

leagues, and bounded by Citizen Fernando Felez on the south, and on the other sides by the unchristianized Indians." The petition was accompanied by a map representing the land solicited, and by a certificate of General Vallejo that the land was vacant, and did not belong to any private person. On the margin of this petition is a decree of the governor, dated May 24, 1845, which is as follows: "That which the interested party requires is granted to him, and for that purpose let the corresponding title be issued." "The governor of the department thus decreed, ordered and signed. Pio Pico." To this petition a note is added, which, however, is not signed, stating that a note of the title has been made in the respective book. To this note succeeds a memorandum, dated May 8th, 1846, stating that the expediente was on that day reported to the most excellent departmental assembly, and ordered to be passed to the committee on vacant lands. This memorandum is signed by Pio Pico, president, and Augustine Olveira, secretary. The report of the committee follows. It is dated May 26, 1846, and contains a proposition for the approval of the grant. On the third of June, 1846, the proposition of the committee is adopted by the assembly. The genuineness of this expediente, and of the signatures to the documents which compose it, is unquestioned. It is found among the records of the former government, duly numbered, and it is entered on the index made by Messrs. Hartnell and Halleck, in continuation of Jimeno's index. The marginal order directing that a title be issued is in the handwriting of Juan Bandini, who was at that time secretary of state. The signature of Pio Pico to the order is undoubtedly genuine.

The order referring the expediente to the committee on vacant lands is in the handwriting of Cayetano Arenas, who often wrote in the office of the departmental assembly and of the secretary of state, and it is signed with the genuine signatures of Pico, the president of the assembly, of Olveira, the secretary. The report of the committee is in the handwriting of and signed by Santiago Aguello, its chairman, and the entry of the approval is in the handwriting of Cayetano Arenas. There is also found in the archives, among the borradors, or rough drafts of orders made by the governor in the month of May, 1845, an entry in the handwriting of Narciso Botello (who was one of the clerks in the office of the secretary of state) of the decree made on the petition of Juares. It is a literal copy of the decree in the margin of the petition, and across it a line is drawn as a check, to show that the order had been entered in the proper book. This book, commonly known as the "Book of Toma de Razon," is also found in the archives. It contains, under date of May 24, 1845, a note, in the usual form, that a title grant was made to Cayetano Juares of the place known as

"Yokaya." On recurring to the journals of the departmental assembly, we find the proceedings of that body, with respect to the grant, recorded precisely as in the testimonio, or certificate of approval, contained in the expediente. There is thus produced, in support of this claim, all the evidence which the records of the Mexican government could in any case afford, with the single exception that the expediente does not contain, as is usual, the unsigned borrador, or copy of the titulo delivered to the party.

The existence of the expediente in the archives, with its numerous signatures and handwritings of unquestionable genuineness —the note and description of the grant in the continuation of Jimeno's index—the entry in the Toma de Razon, and the record in the journals of the departmental assembly— prove, beyond all doubt, that a grant was made, on the 24th May, 1845, to Cayetano Juares for eight leagues in the place called "Yokaya." There is also produced the titulo alleged to have been delivered to the claimant. But the signatures to this document present a most suspicious appearance. That of Pio Pico is very unlike his genuine signature at the date of the instrument. The handwriting, too, of the body of the instrument is that of Victor Prudon, by whom the grant produced in the case of G. L. Brown v. The United States was written, and which is undeniably fraudulent. The character of the signatures, and the whole appearance of the document, justifies the conclusion that it is not genuine. But that the grant was made, is, as we have seen clearly proved by evidence the most reliable that is afforded in this class of cases, viz., the official records of the former government.

The fact that the document produced by the party is forged is readily explained, by supposing that the grant issued to him has been lost, and that he has been tempted to manufacture another, of the same import, to replace it. Ignorant, and not scrupulous, alarmed lest the absence of his title papers should be fatal to his claim, it is, perhaps, not to be wondered at that he has accepted the offer of Prudon to supply the missing document, a service which it is well known that person liberally rendered, even in cases where no grant had ever been obtained from the former government. By whom this fraud was procured to be committed cannot now be ascertained. It was certainly not done by those who now represent the rights of the original grantee—nor is it probable that the original grantee was concerned in it; for it appears that Juares had conveyed his entire interest in the grant to M. G. Vallejo before the claim was presented to the board. Rejecting then, the title paper produced by the claimants, as not genuine, there still remains the most clear and indubitable proof that a grant in fact issued to Juares for the land now claimed, and that this grant was approved by the departmental assembly, and

thus became "definitely valid." It was, therefore, private and not public land at the date of the acquisition of the country, and, on the principles laid down by the supreme court, in the Case of Heirs of West, 22 How. [63 U. S.] 315, the title must be confirmed to the representatives of the claimant, unless it has been forfeited by abandonment, or neglect to fulfill the conditions. With respect to the occupation and settlement effected by Juares, there is some conflict of testimony. It is proved, however, beyond any reasonable doubt, that at about the time he applied for the grant Juares sent his brother to the land with cattle and horses, to establish a rancho. Vicente Juares remained upon the land about five months, when he left, but, returning after a short absence, continued to reside there until a party under Fremont, in the early part of 1846, carried off the horses. Vicente Juares states that while he was on the rancho he built two corrals and a small house on the bank of the river. Houses were also put up for the Indians employed on the rancho. When he first went to establish the rancho, Cayetano Juares accompanied him, and remained about eight days, leaving Vicente in charge. He again visited the rancho towards the end of 1845, and again in 1848, after the horses were carried away by Fremont, he came up to look after the cattle. After remaining a few days, he returned to Napa, leaving two vaquerors and Indians on the rancho. They staid about a month, when they returned to Napa. No more cattle appear to have been placed on the rancho, but it is stated by Vicente that the Indians left there during the years 1847 and 1848, and that he went to the rancho in those years to carry beeves to them. They occasionally came to Napa to work for Cayetano, but returned to Yokaya, where they continued to work the fields established by Vicente—planting corn, melons and beans, with seed which Cayetano furnished, to keep them occupied, and to keep up the possession of the place. The testimony of Vicente Juares is corroborated by Julio Carillo, who states that he visited the rancho in June or July, 1845. He found Vicente residing on the rancho, with some civilized Indians, one of whom he recognized as having lived with Cayetano at Napa, and whose name he gives. Vicente had a small house, corrals, horses and cattle on the land.

Jesse Beasley, a witness on behalf of the United States, testifies that he accompanied Carillo on this excursion to Yokaya in 1845, but that he did not see Vicente Juares there, nor any cattle, horses or houses on the land, nor any signs of its occupation. When asked as to the character of Carillo, however, he says that "it is as good as any man's in the county where he lives. He has a high character, and is an honest, upright gentleman; but, in this instance, one or the other of us is mistaken." If this estimate of Carillo's character be correct, and it is not questioned, there is little difficulty in deciding which of the two is mistaken. Carillo testifies that he went to Yokaya in 1844, before the establishment of the rancho; and again in 1845, when Vicente was in the occupation of it, as has been stated. Independently, therefore, of the impossibility of his having made any honest mistake as to the circumstances detailed by him with so much particularity, it is most probable that Beasley is mistaken as to the year in which he went there himself, and that he accompanied Carillo on the excursion of 1844, and not on that of 1845.

The testimony of Barnett, a witness for the United States, is inconclusive. He merely states that he never heard of Cayetano Juares' having sent stock to Yokaya, or that Fremont's party, of which he was one, took horses from that rancho. He admits, however, that the men told him they had obtained some horses from Cayetano—from what rancho he evidently does not know, for he could not have been with the party when the horses were procured, as he learned the fact from the statements of his companions. An attempt was made to show that stock could not have been sent there, as the witness lived on the road, and did not see them pass. But it appears that the other road, which was the best and most traveled, was at the distance of more than twenty miles from the residence of the witness. The evidence of Carillo and Juares is further corroborated by that of William B. Frazer. This witness states that he was on the Yokaya rancho in 1845, and again in March, 1846. He found there a Spaniard named Juares. There was a house, and two places fenced, one a corral, and the other had the appearance of a garden. The garden had some stalks of corn and indications of melon vines. There were horses and cattle on the land. The witness staid there all night, and Juares seemed to be living there with some Indian vaquerors. This was in December, 1845. In 1846 he did not stop, but saw horses and cattle, and the same houses he had seen in 1845, also a number of Indian huts on the plain. The witness further states, on cross-examination, that he was told of the rancho of Juares, in Yokaya valley, before going there, by several persons, whom he names, at Bodega, and that the valley was generally known by that name by the people residing about Bodega and Sonoma.

The above is all the testimony of any importance relating to the occupation of the land. The statements of Vicente Juares are, it will be noticed, corroborated by the testimony of two other witnesses, who swear to facts about which they cannot have been mistaken. Their characters are unimpeached, and I know of no reason for distrusting the statements of either Vicente Juares or Carillo, neither of whom belong to that class of professional witnesses with whom the court is familiar, or for refusing to accept as accurate the estimate of Carillo's charac-

ter given by Beasley. It does not appear that since the occupation of California by the American forces any serious attempt has been made by the grantee to resume the occupation and cultivation of the land. But, under the ruling in the case of Fremont v. U. S. [17 How. (58 U. S.) 542], no neglect can, on that account, be charged to the grantee, as a ground of forfeiture. After that event, "he could do nothing," says the supreme court, "which could, in any degree, affect the rights of the United States to public property," and it has, in several cases, been clearly intimated, if not expressly declared, by that tribunal, that the rights to be passed upon in these cases are those which existed at the time of the acquisition of the country. The forfeiture by abandonment must, therefore, have accrued, if at all, before California was subjected to the American arms—and rights of the United States or the claimant to the land remained in their then condition, unaffected by any acts or omissions of the grantee.

If the testimony in this case is to be believed, and I see no reason to doubt it, there certainly had been no abandonment of his rights by the grantee during the existence of the former government, even if a forfeiture for that cause could now be enforced in the case of a grant made "definitively valid" by the approval of the departmental assembly—a point not yet decided by the supreme court—and any subsequent neglects or delays are, as decided by that court, immaterial.

It is urged that the description of the land is so vague that it cannot be identified. But it appears by the testimony of James Tobin that the valley of Yokaya is a clearly defined piece of land, lying along the Russian river, and bounded on the east, west and south by mountains. The southern boundary of the valley is the northern boundary of the rancho of Fernando Feliz, which we have seen is mentioned in the petition as the southern boundary of the tract solicited. Mr. Tobin adds that the map, though not perfect, is nevertheless sufficient to enable him to identify the tract represented on it as the Yokaya valley described by him. My own knowledge of the country leads me to the same opinion, and a surveyor required to measure off eight square leagues of land in the Yokaya valley, north of the Feliz rancho, would, I am persuaded, have no difficulty in determining its limits with as much precision as is usual in this class of cases.

On the whole, my opinion is, that the grant, having been undoubtedly made by the former government, the grantee's rights have not been forfeited, and the claim must be confirmed.